UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CORDARISE HOUSTON,

                                        Petitioner,

                                                            Case No. 18-CV-723-FPG

v.

                                                            DECISION AND ORDER

STATE OF NEW YORK,

                                        Respondent.

## INTRODUCTION

Petitioner Cordarise Houston, who is represented by counsel, has filed an application for habeas corpus relief pursuant to 28 U.S.C. § 2254, challenging his state court convictions.  *See* ECF No. 1.  The Court has received a copy of the State Court Record (ECF No. 9-2, hereinafter "SCR") and Respondent has filed an opposition memorandum.  ECF No. 8.  Houston has filed his reply.  ECF No. 21.  For the reasons that follow, Houston's request for habeas relief is DENIED, and his petition is DISMISSED.

## BACKGROUND

In July 2013, Houston was indicted in New York state court on one count of second-degree attempted murder, one count of first-degree assault, and one count of second-degree criminal possession of a weapon.[1]  SCR at 10-12.  The State's theory was that, early in the morning on May 26, 2013, Houston shot the victim, John Petty, while they were at Petty's home.  *See* ECF No. 9-3 at 372 [hereinafter "Trans."].

The Court need only highlight a few relevant aspects of the trial.  One of the critical pieces of evidence was a recording of a 911 call that Petty made moments after he was shot.  The 911

---

[1] Houston was also indicted on a charge of criminal use of a firearm in the first degree, but that charge was later dismissed by agreement.  *See* ECF No. 9-3 at 126-27.

dispatcher received the call at 12:50 A.M.  During the call, Petty tells the dispatcher that he has been shot and to come quickly to his home.  The dispatcher asks Petty who shot him.  Petty responds that "Cordarise Houston" shot him, and that Houston had left on foot but that he did not know where Houston had gone.  Petty repeats again and again that he "is dying" and to "hurry up."[2]

As a result of the 911 call, fire, police, and ambulance responded to Petty's home.  Three police officers arrived at Petty's home at 12:53 A.M.  Trans. at 402.  They had received a report of "shots fired," that "a victim [] had been shot," and that it was unknown "where the suspect was." *Id.* at 398.  Officers Daniel Haney and Wayne General entered the residence and saw Petty lying face down on the living room floor.  Officer Haney testified that Petty had a gunshot wound in his arm, was bleeding, was "going in and out of consciousness," had a "phone laying next to his ear," and was "asking for help."  *Id.* at 404-05.  The room was cloudy and Officer Haney could smell gunpowder in the air.  *Id.* at 406.

Officer Haney approached Petty and "asked who had shot him and where they went."  *Id.* at 405.  Officer Haney had to repeat his questions a few times because he could not understand Petty's responses: "It was - - sounded like Cordarise, Cordelius.  Each time he was definitely saying Houston.  The first name I couldn't really make."  *Id.* at 407.  Petty also told Officer Haney that Houston was wearing black but that he was not sure where he had gone.  *Id.*  Officer Haney relayed the information over the radio to other responding officers as they were looking for the suspect.  *Id.*  However, Houston was not apprehended until a few days later, when police located him at a nearby motel.  Trans. at 583.

---

[2] A CD containing the audio recording was submitted to the Court.  *See* ECF No. 10.

At trial, John Petty testified that he did not remember the incident or Houston's involvement therein.  He remembers selling marijuana on the evening of May 25, 2013, but his next memory was waking up in the hospital after the shooting.  *See id.* at 595-96.  He has no recollection of being at home on the morning of May 26, being shot, or calling 911.  *Id.* at  598, 606.  He could not identify the shooter.  *Id.* at 607.  But Petty did testify that, at the time of the shooting, he got "along well" and was "friendly" with Houston.  *Id.* at 594.

On April 2, 2014, the jury reached its verdict, finding Houston guilty on all three counts. Trans. at 965-66.  Houston was sentenced to a total term of imprisonment of thirty-two years.  *Id.* at 975-76.  On September 30, 2016, the Appellate Division rejected Houston's arguments on appeal but partially modified his sentence.  *People v. Houston*, 142 A.D.3d 1397 (N.Y. App. Div. 2016).  The Court of Appeals denied leave to appeal.  *People v. Houston*, 74 N.E.3d 682 (N.Y. 2017) (table op.).

In January 2017, Houston filed a *pro se* motion to vacate under N.Y. Criminal Procedure Law § 440.10.  *See* SCR at 321-633.  On May 1, 2017, the Niagara County Court denied the motion.  *See* SCR at 796-801.  In July 2017, the Appellate Division denied leave to appeal the County Court's order.  SCR at 1565.

In June 2018, Houston filed the present habeas petition.

## DISCUSSION

In support of his petition, Houston argues that: (1) the trial court erroneously admitted Petty's hearsay statements to the 911 dispatcher and to Officer Haney; (2) the admission of Petty's hearsay statements to Officer Haney violated the confrontation clause; (3) defense counsel, Angelo Musitano, provided ineffective assistance of counsel;  (4) the trial court erred when it declined to provide a circumstantial-evidence instruction to the jury; (5) the prosecutor engaged in misconduct

during her summation; and (6) the prosecutor made speculative and prejudicial comments at sentencing. *See generally* ECF No. 1.  The Court examines each argument in turn.

Section 2254(d) of Title 28 permits a federal court to grant a habeas corpus petition with respect to a state conviction where  the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In order to overturn a state court's decision on the first ground—that the decision conflicts with "clearly established Federal law"—the petitioner may pursue one of two paths.

"First, a petitioner may show that a state court's decision was 'contrary to' federal law, by demonstrating either (1) that the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court, or (2) that, when presented with facts that are materially indistinguishable from a relevant Supreme Court precedent, the state court arrived at a result opposite to the one reached by the Supreme Court." *Evans v. Fischer*, 712 F.3d 125, 132 (2d Cir. 2013).

"Alternatively, a petitioner may prevail by showing that a state court's decision involved an 'unreasonable application' of federal law." *Id.* at 132-33.  "A state court decision involves an unreasonable application of federal law if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the case before it." *Id.* at 133 (internal quotation marks omitted).  This involves "[s]ome increment of incorrectness beyond error." *Id.*

4

Concerning the second ground, "a federal habeas court may grant relief where the state court's determination 'was based on *an unreasonable determination of the facts* in light of the evidence presented in the [s]tate court proceeding.'" *Evans v. Griffin*, No. 16-CV-5438, 2019 WL 3997439, at *11 (E.D.N.Y. Aug. 23, 2019) (quoting  28 U.S.C. § 2254(d)(2)).  The question is whether the evidence "can fairly be read to support the trial court's factual determinations," and a state court's factual determination "is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Id.*  "Where reasonable minds reviewing the record might disagree as to the relevant finding, that is not sufficient to supplant the state court's factual determination." *Id.* (internal quotation marks and brackets omitted).

## I.    Hearsay Statements

Before trial, the parties litigated the issue of whether Petty's statements to the 911 operator and to Officer Haney should be excluded as hearsay.  Trans. at 32-53.  The trial court ruled that both sets of statements were admissible as excited utterances.  *See id.* at 44-48, 121.  Houston challenged those rulings on appeal, *see* SCR at 166, 173-74, which the Appellate Division rejected. *Houston*, 142 A.D.3d at 1397.

In his habeas petition, Houston maintains that the statements did not fall within the exception for excited utterances, and that the admission of the evidence was so prejudicial that it denied him "due process of law and his right to a fair trial."  ECF No. 21 at 2-5.  The Court disagrees.

Ordinarily, "errors of state evidentiary law are not cognizable on habeas review, and thus erroneously admitted hearsay statements cannot provide a basis for federal habeas relief unless the evidentiary error so undermined the fairness of the trial as to violate the petitioner's constitutional right to due process."  *Sorrentino v. LaValley*, No. 12-CV-7668, 2016 WL 11482062, at *16

5

(S.D.N.Y. Feb. 3, 2016) (internal citation omitted).  "[I]n determining whether the introduction of a particular hearsay statement violated a petitioner's constitutional right to due process, a habeas court must conduct a two-part analysis that inquires: (1) whether the trial court's evidentiary ruling was erroneous under state law, and (2) whether the error deprived the petitioner of the constitutional right to a fundamentally fair trial."  *Id.*  Houston cannot pass the first step.

In New York, "[e]xcited utterances are exceptions to the hearsay rule because the declarant is exposed to a startling or upsetting event that is sufficiently powerful to render his normal reflective processes inoperative."  *People v. Cantave*, 993 N.E.2d 1257, 1263 (N.Y. 2013) (internal brackets and quotation marks omitted).  "The essential element of this hearsay exception is that the declarant spoke while under the stress or influence of the excitement caused by the event, so that his reflective capacity was stilled."  *Id.* (internal quotation marks omitted).  "The spontaneity of the declaration guarantees its trustworthiness and reliability."  *Id.*

New York courts routinely admit as excited utterances victims' statements to 911 dispatchers and police officers shortly after the criminal conduct.  *See, e.g.*, *People v. Fratello*, 706 N.E.2d 1173, 1175 (N.Y. 1998) (victim's statement to responding officer properly admitted, where officer responded to scene ten minutes after shooting, victim was "crying hysterically," and he repeatedly "identified defendant as the person who shot him"); *People v. Jaber*, 172 A.D.3d 1227, 1230 (N.Y. App. Div. 2019) (victim's 911 calls admissible, where victim made calls five minutes after defendant cut victim's hand with butcher knife); *People v. Gantt*, 48 A.D.3d 59, 64 (N.Y. App. Div. 2007) (victim's statement to responding officer admissible, where victim made statement while lying "seriously wounded and bleeding on the sidewalk almost immediately after the shooting"); *People v. Walker*, 238 A.D.2d 246, 246 (N.Y. App. Div. 1997) ("The complainant's 911 call was properly admitted as an excited utterance, where it was made five minutes after

6

defendant forced his way into the complainant's apartment, threw her to the floor and successfully struggled with her for her pocketbook.").

Consistent with these authorities, the Appellate Division properly found Petty's statements admissible as excited utterances.  The audiotape of the 911 call and Officer Haney's testimony establish that Petty made the statements soon after being shot, while he was lying on the floor in a pool of his own blood.  *See* ECF No. 10; Trans. at 57-99.  During the 911 call, Petty repeatedly shouts that he believes he's dying; groans and heavy breathing can be heard.  As the Appellate Division reasoned:

> The record establishes that the victim made the statements very shortly after the shooting and repeatedly said that he was dying, and we are satisfied that he spoke under the stress of the excitement caused by being shot and severely injured, while his reflective capacity was stilled.

*Houston*, 142 A.D.3d at 1397 (internal quotation marks omitted).  Like the cases cited above, these circumstances represent a "near-classic example[] of the excited utterance exception."  *Fratello*, 706 N.E.2d at 1175.

Furthermore, contrary to Houston's argument, the mere fact that Petty was "going in and out consciousness" does not necessarily mean he "lack[ed] the mental ability to recount precise information" and therefore was unreliable.  ECF No. 21 at 4.  Although his injuries clearly interfered with his ability to communicate, Petty was still able to provide relevant answers to the dispatcher's and Officer Haney's questions, and he identified Houston as the shooter multiple times.  Indeed, in his brief to the Appellate Division, Houston acknowledged as much.  *See* SCR at 174 ("Although obviously in extreme pain, [Petty] responded to the questions of the dispatcher to the extent that he was able to give an address and to correct the dispatcher when she mistook

his name.  The statements to Officer Haney, moments later, also showed that he was mentally aware of his situation and able to respond to direct questions.").

Accordingly, the Court can discern no error with the state court's disposition of the hearsay objection.

## II.  Confrontation Clause

Houston next argues that the admission of Petty's statements to Officer Haney violated his rights under the confrontation clause.  The trial court and the Appellate Division concluded that Houston's rights were not violated because the primary purpose of Petty's statements to Officer Haney was to address "an ongoing emergency."  *Houston*, 142 A.D.3d at 1398; *see also* Trans. at 121-23.  In his brief, Houston disputes there was an ongoing emergency by the time police arrived.  He reasons that, since Petty told police that "the shooter [had] departed the scene," there was no ongoing emergency or threat "to the public."  ECF No. 21 at 7.  Furthermore, because Petty named a friend as the shooter, "it was clear this was a sequestered dispute."  *Id.*

The Court is not persuaded.  "The Sixth Amendment's confrontation clause provides that in 'all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'"  *Hamilton v. Lee*, 94 F. Supp. 3d 460, 471 (E.D.N.Y. 2015) (quoting U.S. Const. amend. VI).  The clause "prohibits the admission of a witness's *testimonial* statements."  *Id.*  "Statements are *non-testimonial* when made in the course of . . . interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to . . . meet an ongoing emergency," but are testimonial "when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  *Id.* (internal quotation marks omitted).

8

The Supreme Court's decision in *Michigan v. Bryant*, 562 U.S. 344 (2011)—which clarifies what constitutes an "ongoing emergency" for confrontation-clause purposes—presents an insurmountable obstacle to Houston's claim.  In *Bryant*, officers responded to a gas station, where a person was found lying on the ground with a gunshot wound.  *Bryant*, 562 U.S. at 349.  "The police asked [the victim] 'what had happened, who had shot him, and where the shooting had occurred.'"  *Id.*  The victim responded that the defendant "shot him [approximately a half-hour before]."  *Id.*  "He also indicated that he had a conversation with [the defendant], whom he recognized based on his voice, through the back door of [the defendant's] house.  [The victim] explained that when he turned to leave, he was shot through the door and then drove to the gas station, where police found him."  *Id.*  Thus, the *Bryant* court framed the factual context as follows: "a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim."  *Id.* at 359.

At the outset, the court noted that the "[t]he existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than proving past events potentially relevant to later criminal prosecution.  Rather, it focuses them on ending a threatening situation."  *Id.* at 361 (internal citation, brackets, and quotation marks omitted).  Whether an emergency exists and is ongoing is an objective, "highly context-dependent inquiry."  *Id.* at 363.  In the case of a domestic-violence incident, where the threat is to a specific victim, a court focuses on "the threat to the victim[] and assesse[s] the ongoing emergency from the perspective of whether there was a continuing threat" to that victim.  *Id.*  By contrast, where the threat is to police or the public at large, "[a]n assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on

9

whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." *Id.*

Applying these principles, the Supreme Court held that the statements elicited from the victim were nontestimonial, reasoning:

> [T]he police responded to a call that a man had been shot. . . .   [T]hey did not know why, where, or when the shooting had occurred.  Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred.  The questions they asked—"what had happened, who had shot him, and where the shooting had occurred,"—were the exact type of questions necessary to allow the police to assess the situation, the threat to their own safety, and possible danger to the potential victim, including to allow them to ascertain whether they would be encountering a violent felon.  In other words, they solicited the information necessary to enable them to meet an ongoing emergency.

*Id.* at 375-76 (internal quotation marks, citations, and footnotes omitted).  Furthermore, nothing in the victim's responses "indicated to the police that, contrary to their expectation upon responding to a call reporting a shooting, there was no emergency or that a prior emergency had ended."  *Id.* at 377.  The victim told police he "had been shot at another location about 25 minutes earlier, but he did not know the location of the shooter at the time the police arrived . . . .  In fact, [the victim] did not indicate any possible motive for the shooting, and thereby gave no reason to think that the shooter would not shoot again if he arrived on the scene."  *Id.*

If anything, the facts presented in Houston's case even more strongly suggest the existence of an ongoing emergency than the facts in *Bryant*.  Police responded to Petty's residence based on a report that a person had been shot and that the suspect's whereabouts were unknown.  Trans. at 59.  They arrived just minutes after Petty called 911.  The front door was ajar, and when Officer Haney entered, he saw Petty lying on the floor in a pool of blood.  *Id.* at 61-62.  Officer Haney could smell gunpowder and noticed a "cloud" of smoke in the air, from which he inferred that the shooting had just occurred.  *Id.* at 64.  Believing that the suspect was "armed and dangerous,"

Officer Haney elicited the statements from Petty to determine who and "where the suspect was" so that officers could locate the suspect and end the "dangerous situation." *Id.* at 63, 66.  As in *Bryant*, police were faced with a situation in which an armed gunman had attacked a person in his home, but they did not know "why . . . the shooting had occurred," where the shooter had fled, or "anything else about the circumstances" of the crime.  *Bryant*, 562 U.S. at 375-76.  The questions Officer Haney posed to Petty were  the "exact type of questions" necessary to enable police "to meet an ongoing emergency."  *Id.* at 376.  Consistent with *Bryant*, Petty's statements—made informally during a medical and safety emergency, while the nature of the crime and the suspect's whereabouts were unknown—were non-testimonial.  *Accord Nieves-Andino v. Conway*, No. 08-CV-5887, 2010 WL 1685970, at *16-17 (S.D.N.Y. Apr. 20, 2010) (victim's statements to responding officer were non-testimonial, where victim was lying on the ground bleeding and in pain, officer arrived fifteen minutes after the shooting, and officer asked questions to assist the victim medically and determine "what, if any action was necessary to prevent future harm").

Houston responds that, because Petty told officers that the Houston had left the scene, there was no longer an "ongoing emergency."  ECF No. 21 at 7.  In addition, because "the victim relayed [the suspect's] name, it was clear this was a sequestered dispute."  *Id.*  Houston's argument is not supported by the record.  To the contrary, the fact that an armed gunman had shot a person in his own home, had fled, and was at large establishes there *was* an ongoing emergency.  Although Petty told police the suspect's name, he did not convey any information that would have indicated that this was a mere private dispute that was fully resolved once Petty was shot several times and left in a pool of his own blood.  The suspect's motive was unknown, and it was objectively reasonable for police to believe that the suspect posed an ongoing threat.  To that end, Petty's statements were solicited to meet an ongoing emergency, and they were therefore non-testimonial.

11

This case is unlike, for example, an incident of domestic violence, where the assailant only poses a danger to one particular victim and, once police arrive on scene, that danger dissipates. *See, e.g.*, *Davis v. Washington*, 547 U.S. 813, 829-30 (2006) (no ongoing emergency, where, once officers arrived at residence on a report of a domestic disturbance, victim told officers "things were fine," she was separated from assailant during interrogation, and there was no "immediate threat to [the victim]").

Consequently, as the Appellate Division correctly held, the confrontation clause did not bar the use of Petty's statements to Officer Haney at trial.  *See Houston*, 142 A.D.3d at 1397-98. Houston is not entitled to relief on this ground.

## III.    Circumstantial-Evidence Instruction

Houston contends that the trial court erred by failing to include a circumstantial-evidence charge in its jury instructions.  *See* ECF No. 21 at 13-14.  This argument does not require extended analysis.  Under New York law, "a circumstantial evidence jury charge is only required, at the defendant's request, when the evidence against a defendant is comprised *solely of* circumstantial evidence."  *Norwood v. Artis*, 487 F. Supp. 2d 321, 333 (W.D.N.Y. 2007) (collecting cases). Petty's excited utterances to the 911 dispatcher and police identifying Houston as the shooter constitute direct evidence of Houston's guilt.  *See People v. Pagan*, 177 A.D.2d 604, 605 (N.Y. App. Div. 1991) ("[T]he victim's excited utterances following the shooting in which he named the defendant as the person who shot him constitute direct evidence of the defendant's guilt. . . .  The victim's statements were no less direct evidence merely because they were made out of court yet properly admitted into evidence pursuant to an exception to the hearsay rule."); *Norwood*, 487 F. Supp. 2d at 333.  Accordingly, the Appellate Division was correct that Houston "was not entitled to a complete circumstantial evidence charge inasmuch as the excited utterances of a victim

12

identifying the shooter constitute direct evidence of guilt." *Houston*, 142 A.D.3d at 1398 (internal quotation marks and brackets omitted).

## IV.    Ineffective Assistance of Counsel

Houston argues that his trial counsel provided ineffective assistance in several respects, and that counsel's errors led him to reject a plea offer and proceed to trial.  For ease of analysis, the Court examines each argument separately.

To establish a claim for ineffective assistance of counsel under the Sixth Amendment, a petitioner must show both "(1) that counsel's representation was objectively deficient, and (2) ensuing prejudice." *Boyland v. Artus*, 734 F. App'x 18, 20 (2d Cir. 2018) (summary order); *see generally Strickland v. Washington*, 466 U.S. 668 (1984).   "At the first step, courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  At the second, they ask not whether counsel's error had some conceivable effect on the outcome of the proceeding, but whether it so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Boyland*, 734  F. App'x at 20 (internal quotation marks and citations omitted).

To establish prejudice in the context of a plea, "a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012).  "When the prejudice alleged is the rejection of a plea offer, a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been accepted by the defendant and presented to the court . . . , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed." *Rodriguez v. United States*, 679 F. App'x 41, 43 (2d Cir. 2017) (summary order).  The issue of whether a

defendant would have accepted a plea agreement absent ineffective assistance of counsel is a factual determination.  *See Herzog v. United States*, 38 F. App'x 672, 675 n.2 (2d Cir. 2002) (summary order);  *Purdy v. United States*, 208 F.3d 41, 49 (2d Cir. 2000).

### a.   Counsel's Optimistic View of Houston's Case

Houston's central claim is that defense counsel, Angelo Musitano failed to give proper advice on whether to accept the plea offer tendered by the government.  This is because, during their conversations about the case, Musitano was overly optimistic about Houston's chances of success at trial.  Houston alleges that counsel told him he "had a great chance of obtaining an acquittal on the crimes charged."  SCR at 366.  In Houston's retelling, Musitano was of the view that the "prosecutor's case rested on [Petty's] hearsay statements."  *Id.*  He believed he could convince the jury to find those statements unreliable, as they were made while Petty "was going in and out of consciousness"; Petty gave "three or more names for the perpetrator"; there was no motive or weapon; and Petty described Houston as a friend.  SCR at 366-70.

In addition, Houston asserts that counsel's assessment of the case was founded on several legal positions which were erroneous—that Petty's statements would be inadmissible as hearsay or due to the Confrontation clause, and that, even if admitted, those statements were not "direct evidence" sufficient to support a conviction.  SCR at 366-67.  Houston avers that counsel's optimism about the case  dissuaded him from accepting the plea offer.  He contends that Musitano should have told him that the prosecution's case was in fact "open and shut" and that "an acquittal was unlikely in light of the prosecution's evidence."[3]  SCR at 355-56.

---

[3] The record does not contain an affidavit from Musitano concerning his conversations with Houston. However, as Respondent points out, the Court cannot seek to develop the record further, since "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see also* ECF No. 23.  For that reason, the Court denies Houston's request for further time to obtain a statement from Musitano.  *See* ECF No. 24.

Houston presented these arguments to the Niagara County Court as part of his collateral challenge to his conviction. *See* SCR at 350-64. The Niagara County Court's decision explicitly focused only on two aspects of Houston's claim—that counsel was "ineffective because he failed to comprehend the law regarding the admissibility of excited utterances and the use of an excited utterance as direct evidence." SCR at 799. The court rejected those arguments on prejudice grounds. It reasoned:

> [A]t the time of the final plea offer to Defendant, on the morning of jury selection on March 24, 2014, Mr. Musitano and Defendant were well aware that the 911 call would be used at trial and that there was no other direct evidence of Defendant's guilt, leaving it to the jury to decide whether the 911 call provided sufficient proof of Defendant's guilt. Yet Defendant, armed with that knowledge, rejected the plea offer once again, belying his present contention that had [counsel] properly advised him of the law, he would have accepted the plea.

SCR at 801. In other words, the county court found that Houston could not establish prejudice prong of *Strickland*. The Appellate Division rejected Houston's appeal of the county court's decision without comment. SCR at 1565.

As to the alleged errors it addressed, the county court's decision was correct. By the time of jury selection, Houston knew that the hearsay statements would be admissible at trial, but he nonetheless rejected the plea offer. *See* Trans. at 128. Because Houston rejected the plea offer even after learning that Musitano was incorrect, he cannot show that he "would have accepted the plea" but for that error. *Lafler*, 566 U.S. at 164; *cf. Colabatistto v. United States*, No. 15-CR-6128, 2020 WL 7480722, at *5 (W.D.N.Y. Dec. 18, 2020) (on claim that petitioner rejected plea offer because counsel failed to advise him of possible sentences he faced after trial, petitioner could not establish prejudice where record showed that he was, in fact, aware of the possible sentences at the time he rejected the offer).

Likewise, at a pretrial hearing ten days before trial, the trial court noted that Petty's hearsay statements were the only evidence the government had "to prove the identity of the shooter." Trans. at 46. The court then remarked, "Whether the People will be able to establish the defendant's identity to the level required by law is ultimately a question that we'll deal with at trial and *ultimately that question that the trial jury will resolve*." *Id.* at 46-47 (emphasis added). Thus, as the county court reasoned, even if Musitano incorrectly advised Houston that Petty's statements were legally insufficient "direct" evidence to establish guilt, the trial court's discussion that the issue would be for the jury to decide would have disabused Houston of that notion. When Houston later rejected the plea offer at jury selection, he would have done so with the knowledge that a jury could find him guilty. He therefore cannot demonstrate prejudice.[4]

However, outside of those two narrow arguments, the county court did not address Houston's broader contention that—separate and apart from his legal misunderstandings—Musitano was overly optimistic about his legal strategy and Houston's chance of acquittal at trial, which caused Houston to reject a favorable plea offer. It is that issue the Court now addresses.

---

[4] Regardless, the record suggests that Houston simply misinterpreted Musitano's statements. There is evidence that, in discussing the probative value of Petty's statements, Musitano was indicating only that he was confident he could convince the jury to find Petty's statements unreliable, not that the statements were *legally insufficient* to support the convictions. *See* SCR at 329, 366-67, 370, 373. For example, Houston alleges that Musitano told him "there was a *good chance* that he will be successful with getting the jury to believe that the hearsay statements were un-reliable." SCR at 329 (emphasis added); *see also* SCR at 366 (alleging that Musitano told him he had a "*great chance* of securing an acquittal" (emphasis added)). These statements are couched in terms of probabilities, not legal sufficiency. Houston would not be entitled to habeas relief to the extent he misunderstood Musitano to mean that Petty's statements were legally insufficient to support the convictions. *See Vidro v. United States*, No. 94-CR-112, 2003 WL 22871691, at *2 (D. Conn. Dec. 1, 2003) ("[The defendant's] own misunderstanding is not a proper basis for bring a collateral attack.").

Even without an explicit rationale, the Court's review of the county court's decision remains highly deferential.[5]  "When a state court rejects a constitutional claim without explanation . . . [the habeas court's] job is to determine what arguments or theories supported or . . . *could have supported* the state court's decision, and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court."  *Golb v. Attorney General of the State of New York*, 870 F.3d 89, 99 (2d Cir. 2017) (internal quotation marks and brackets omitted); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011) (stating that the petitioner must show "there was no reasonable basis for the state court to deny relief").

Furthermore, on a claim for ineffective assistance of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Delancey v. Lee*, 15-CV-891, 2019 WL 9051134, at *26 (E.D.N.Y. Nov. 4, 2019).  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.*  The Court's review is thus "doubly deferential," insofar as it takes "a 'highly deferential' look at counsel's performance" through "the deferential lens of § 2254(d)."  *Cullen*, 563 U.S. at 190.

Under these deferential standards, Houston is not entitled to relief on the basis that counsel's assessment of his case was overly optimistic.  It is well-established that defense counsel "must give the client the benefit of counsel's professional advice on th[e] crucial decision of whether to plead guilty," which includes a duty to "inform the defendant of the strengths and

---

[5] Even where, as here, the state court does not expressly address a claim that a petitioner raises, a federal habeas court must ordinarily presume that "the federal claim was adjudicated on the merits," such that deferential review applies. *Johnson v. Williams*, 568 U.S. 289, 301 (2013); *see also* 28 U.S.C. § 2254(d) (describing deference owed to a state court's disposition of a claim if the claim was "adjudicated on the merits in [s]tate court proceedings").  Houston, who is represented by counsel, does not develop any argument that this presumption should not apply.

17

weaknesses of the case against him." *Purdy*, 208 F.3d at 45 (internal quotation marks omitted). Obviously, the mere fact that Houston lost at trial—and counsel's strategic prediction therefore proved incorrect—is insufficient to demonstrate incompetence in this respect. *See Lafler v. Cooper*, 566 U.S. 156, 174 (2012) ("[A]n erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance."). Houston would need to prove not simply that counsel was wrong, but that counsel's assessment of the case was "completely unreasonable," *United States v. Patterson*, 525 F. App'x 681, 685 (10th Cir. 2013) (summary order), or a "gross mischaracterization" of the evidence. *Anderson v. United States*, 334 F. App'x 8, 10-11 (7th Cir. 2009) (summary order); *see also United States v. Belfiore*, 473 F. Supp.3d 72, 95 (E.D.N.Y. 2020) (collecting cases) ("[C]ourts have repeatedly rejected ineffective assistance claims merely because defense counsel's advice regarding the chances of winning at trial were overly optimistic."). He has not done so.

It may be granted that the government had persuasive evidence of Houston's guilt— namely, Petty's hearsay statements identifying Houston as the shooter. But there were also key omissions in the government's story of the case. The government could not offer any motive for Houston to shoot Petty. Indeed, Petty testified that he and Houston were "friendly." Trans. at 594. There were alternative possibilities for the shooting as well, since Petty candidly admitted that, at the time of shooting, he was a drug dealer and possessed a firearm for protection. *Id.* at 599-600. Finally, while Petty did identify Houston as the shooter to the 911 dispatcher and to police, Officer Haney noted that Petty was "going in and out of consciousness" and was difficult to understand. *Id.* at 404, 425.

In light of these facts, counsel's strategy was reasonable. Because the government's case hinged on Petty's identification, counsel intended to argue that Petty's statements were unreliable

given his extreme condition. *See* SCR at 367. In itself, that was a plausible argument, and it was made more reasonable by the fact that the government could not offer any reason why Houston would shoot Petty. Houston fails to articulate why this was a "completely unreasonable" strategy; he simply asserts, without elaboration, that "[i]t is clear from the record that counsel was unreasonably optimistic regarding the outcome of [the] case." ECF No. 21 at 13. Houston cannot bear his burden without more. *See United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986) ("A defendant . . . may not claim ineffective assistance of counsel merely because in hindsight he thinks counsel's trial strategy was inadequate.").

To be sure, Musitano's confidence may have been grounded, at least in part, on his legal misunderstandings about the admissibility of Petty's hearsay statements and the availability of a circumstantial-evidence instruction. A decision based on legal error may not be a "strategic" decision entitled to deference under *Strickland*. *See, e.g.*, *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."). But the record shows that counsel's strategy was not solely premised on his (erroneous) legal positions. Musitano believed that, independent of any adverse legal rulings, the evidence was such that "he would be successful [in] getting the jury to believe that the hearsay statements were unreliable." SCR at 367. Thus, regardless of his legal misunderstandings, in crafting the defense theory Musitano made a "conscious, reasonably informed decision . . . with an eye to benefitting his client," and it is that sort of decision-making that "federal courts have denominated 'strategic' and been especially reluctant to disturb." *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001); *see also Prescott v. Lee*, No. 11-CV-482, 2013 WL 1192784, at *10-11 (E.D.N.Y. Mar. 22, 2013) (recognizing that counsel may have pursued alibi

19

defense based on "ignoran[ce] of the law" but concluding that decision was nonetheless objectively reasonable given the nature of the evidence).

In short, having reviewed the evidence in the record, the Court cannot conclude that counsel's assessment of the case was a "gross mischaracterization" of the evidence or that his trial strategy was "completely unreasonable." *Belfiore*, 473 F. Supp. 3d at 95. At the very least, "fairminded jurists could disagree" as to whether Musitano's assessment of Houston's case was reasonable, such that the state court's decision must be upheld. *Golb*, 870 F.3d at 99.

### b. Failure to Offer Specific Recommendation

Houston also challenges counsel's refusal to offer any specific recommendation about whether to take the plea offer. Houston alleges that when presented with the offer, he asked Musitano "if he thought I should accept the plea deal." SCR at 367. Musitano told him, "I don't know, you have to decide, it's your life." *Id.* Contrary to Houston's argument, "[t]here is no *per se* rule that defense counsel must always expressly advise the defendant whether to take a plea offer." *Belfiore*, 473 F. Supp. 3d at 89; *see also Purdy*, 208 F.3d at 48 ("[R]easonable professional conduct does not under all circumstances require a lawyer to give an explicit opinion as to whether a client should take a plea offer."). Houston's affidavit establishes that he and Musitano had "numerous conversations" regarding the strengths and weaknesses of his case; Musitano's silence on this one occasion does not, standing alone, amount to ineffective assistance. *See* SCR at 366; *see also Belfiore*, 473 F. Supp. 3d at 92 (noting that the adequacy of counsel's advice must be analyzed in the context of all previous conversations and information available to the petitioner).

### c.   Failure to Review 911 Audiotape

Houston alleges that trial counsel did not review the 911 audiotape, during which Petty identified Houston as the shooter.  *See* ECF No. 21 at 10.  Houston derives this allegation from his reading of the transcript of a pretrial hearing.

Before trial, the state court held a series of hearings to determine the admissibility of various evidence.  At the March 14, 2014 hearing, the court ruled that portions of the 911 audiotape were admissible.  *See* Trans. at 44-45.  Separately, the court noted that the CD containing the 911 audio also included "something that's labeled police radio, [which is] actually a 28 minute and eight second series of calls."  *Id.* at 45.  He ruled that the audio of the 28-minute "police radio calls" was not admissible.  *Id.*  The prosecutor confirmed that she had not intended to proffer that evidence.  *Id.*

At a hearing four days later, defense counsel asked the court about the CD:

MR. MUSITANO: Yes.  Judge, just one thing, when you had reviewed the tape or the CD, you indicated that there were broadcasts in addition to the 911 call between Mr. Petty  and the 911 operator.  The copy I have doesn't have any of that.

MS. HOFFMAN: It's the same copy.  There should be two files.  One has the 911 call and one has the radio transmissions.

MR. MUSITANO: Really?

THE COURT: Well, here, you're welcome to my copy.  The prosecutor indicated to me that she wasn't going to play that, and I indicated that I didn't see how it could be played, although I can see how you might want to question, but there's actually two files on that.

MR. MUSITANO: I don't know how to use a computer, Judge, or anything, but my secretary tried with the copy that Miss Hoffman –

THE COURT: Well, we are safely into the 21st century.  You should learn how, Mr. Musitano.

MR MUSITANO: Thank you, Your Honor.

21

*Id.* at 123-24.

Houston reads this exchange to mean that defense counsel failed to review the inculpatory 911 audio recording, in which Petty identified him as the shooter.  The Court disagrees.  The context of the discussion makes clear that counsel had reviewed the 911 recording but had not reviewed the 28-minute "police radio calls," which consisted of nothing more than radio chatter.  Thus, the premise of Houston's argument is incorrect, and, moreover, he has not articulated how counsel's failure to review the radio chatter caused him any prejudice.

### d.  Failure to Discuss Possible Sentences

Houston notes that, at a pretrial hearing held a few weeks before trial, the government notified the Court and Houston that he faced a "maximum sentence after trial" of 25 years' imprisonment.  Trans. at 26.  On the first day of trial, however, the government clarified that the maximum term was in fact forty years' imprisonment.  *Id.* at 127-28.  In his petition, Houston faults the government for failing to "accurately advise[] the Court and defense counsel of [Houston's] maximum [sentencing] exposure" until the first day of trial, and he argues that he "was denied the effective assistance of counsel" because he and Musitano did not have sufficient time to consider the plea offer in light of the newly revealed maximum sentence.  ECF No. 21 at 8-9.  Houston is not entitled to relief on this ground.

As an initial matter, Houston failed to exhaust this claim, as he did not present it on direct appeal or during state collateral proceedings.  *See* SCR at 166, 323-64.  "Generally, a federal court cannot review a habeas petition unless the petitioner 'has exhausted the remedies available' to him in the state courts.'"  *Cox v. Eckert*, 351 F. Supp. 3d 373, 375 (W.D.N.Y. 2019) (quoting 28 U.S.C. § 2254(b)(1)(A)).  But even if a claim is unexhausted, a federal court may address it on the merits

so long as the claim is denied.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Here, the Court rejects this claim on the merits because Houston offers no evidence to support it.  *See Henderson v. Martuscello*, No. 10-CV-5135, 2013 WL 6463348, at *15 (S.D.N.Y. Dec. 10, 2013) (noting that the petitioner bears burden of proving ineffective assistance of counsel).  The portions of the transcript on which Houston relies simply show that the prosecutor wanted to clarify a misstatement she made *to the court*.  Nothing in the transcript suggests that Musitano, in his private conversations about the plea, had ever misstated the possible maximum sentence *to Houston*.  If anything, the transcript shows that neither Houston nor Musitano found the government's clarification revelatory: Once the matter was clarified, the trial court asked Musitano if that was "[his] understanding of the plea offer," and Musitano confirmed that it was. Trans. at 128.  Likewise, the court questioned Houston, who affirmed that he understood the plea offer and was "not interested in it."  *Id.*

Thus, absent an affidavit or some other evidence, Houston's claim fails on both *Strickland* prongs.  There is no evidence that Musitano—as opposed to the prosecutor—failed to accurately explain Houston's sentencing exposure prior to trial, and there is no evidence that Houston would have accepted the plea offer had he known.  To the contrary, Houston expressly rejected the plea offer even after the government clarified the maximum sentence.  *See id.*  Accordingly, Houston is not entitled to relief on this basis.

## V.   Prosecutorial Misconduct

Houston notes that, during closing arguments, the prosecutor told the jury that Petty believed he was dying at the time he identified Houston as the shooter.  *See* Trans. at 883, 900-01.

Based on those comments, Houston contends that the prosecutor committed misconduct, insofar she implied Petty's statements constituted dying declarations, as opposed to excited utterances. ECF No. 21 at 16.

On direct appeal, the Appellate Division rejected this argument because Houston did not object at trial, rendering the objection unpreserved.  *See Houston*, 142 A.D.3d at 1398 (citing N.Y. Crim. P. L. § 470.05(2)).  This fact bars Houston's claim.

"[A] court may not grant a habeas petition if the state court determination provides an independent basis under state law for denying the federal claim, which adequately supports the result."  *Purdie v. LaClaire*, No. 08-CV-5108, 2010 WL 2838523, at *4 (E.D.N.Y. June 7, 2010). Under New York law, "[p]arties are required to make specific contemporaneous objections at trial to preserve issues for appellate review."  *Roberts v. Lamanna*, No. 19-CV-880, 2020 WL 5633871, at *7 (E.D.N.Y. Aug. 31, 2020).  It is "well-settled that New York's contemporaneous objection rule is an adequate and independent bar to federal habeas review."  *Dick v. Bradt*, No. 09-CV-339, 2014 WL 2434489, at *9 (E.D.N.Y. May 29, 2014).  Because the Appellate Division provided an adequate and independent basis for denying Houston's claimed error, federal habeas review is barred.  *See, e.g.*, *Algarin v. Breslin*, No. 06-CV-3175, 2010 WL 395956, at *4 (E.D.N.Y. Feb. 4, 2010) ("[T]he failure to object to the prosecutor's remarks in summation is an independent and adequate state ground precluding habeas relief."); *Lamanna*, 2020 WL 5633871, at *7 ("The contemporaneous objection rule is an adequate and independent state law ground that procedurally bars habeas review of petitioner's summation claim."); *Bradt*, 2014 WL 2434489, at *9 (collecting cases).

To be sure, "[a] federal court may review a claim that is procedurally barred by an independent and adequate state law ground if the prisoner can demonstrate cause for the default

and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Bradt*, 2014 WL 2434489, at *8 (internal quotation marks omitted); *see also Lamanna*, 2020 WL 5633871, at *7. However, Houston does not even address these issues, let alone carry his burden to make the requisite showing. *See* ECF No. 21; *see also Allan v. Conway*, No. 08-CV-4894, 2012 WL 70839, at *9 (E.D.N.Y. Jan. 10, 2012) (petitioner failed to meet burden where he did not provide "any explanation for his failure to properly exhaust all of his claims in state court"). Furthermore, the Court can discern no reason why the failure to consider this claim will result in a fundamental miscarriage of justice, and, as such, Houston is barred from obtaining habeas relief on this ground. *See Vargas v. Keane*, 86 F.3d 1273, 1280 (2d Cir. 1996) (claim barred where petitioner did not "attempt to show cause or prejudice" and the record did not "support a conclusion that the failure to grant relief will result in a 'fundamental miscarriage of justice'").

## VI.    Prosecutor's Comments at Sentencing

Although Houston's motive for the shooting was not established at trial, *see* Trans. at 899-900, at sentencing, the trial court asked the prosecutor "why this shooting occurred." *Id.* at 974. The prosecutor responded:

> Judge, it has always been partially speculation, but there was an incident that occurred in Niagara Falls a week prior to this, an individual by the name of Joe Medley who was killed, and there's always been speculation that this incident was to shut up Mr. Petty, but there's no actual evidence or proof at this point that could charge Mr. Houston with that murder.

*Id.* at 974-75. Musitano did not object to the prosecutor's comment. *Id.* at 975.

On direct appeal, however, Houston argued that the prosecutor's comment was improper. SCR at 191-92. The Appellate Division rejected that argument and stated, "That contention is not preserved for our review because defendant made no relevant objection at sentencing, and we

decline to exercise our power to review it as a matter of discretion in the interest of justice." *Houston*, 142 A.D.3d at 1399 (internal citations omitted).

In his petition, Houston maintains that the comments about his motive were improper. But, like his claim regarding the improper summation remarks, this argument is barred because the Appellate Division rejected it on an adequate and independent state ground—namely, Houston failed to lodge a timely objection to the remarks. *See id.*; *see also* Trans. at 974-75. Houston offers no argument to avoid this bar; nor does he claim that he has cause for the default or that a fundamental miscarriage of justice would occur as a result. *See* ECF No. 21 at 16-17.

Accordingly, for the same reasons discussed in the preceding section, habeas review of Houston's claim is barred by an adequate and independent state ground. *See Bradt*, 2014 WL 2434489, at *9.

## CONCLUSION

For the reasons stated above, Houston's request for habeas relief is DENIED and his petition (ECF No. 1) is DISMISSED. Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is DENIED. The Clerk of Court shall close the case.

IT IS SO ORDERED.

Dated: March 3, 2021
      Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court